**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mary Ruth Festa, | ) No. CV-13-0143-TUC-BGM |
| Plaintiff, | ) |
| vs. | ) **ORDER** |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 26). Defendant filed her response (Doc. 29), and Plaintiff replied (Doc. 31). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

**I.   BACKGROUND**

*A.   Procedural History*

On August 31, 2010, Plaintiff protectively filed an initial application for Supplemental Security Income ("SSI") alleging disability as of April 22, 2002 due to a heart condition (idiopathic hypertrophic subaortic stenosis), implantable cardiac defibrillator (ICD), depression, ulcer, spasms, and migraines. *See* Administrative Record ("AR") at 19, 50, 59, 71, 76, 129, 149, 154, 181, 203. The Social Security Administration ("SSA") denied this

1  application on January 4, 2011. *Id.* at 77. On January 15 2011, Plaintiff filed a request for
2  reconsideration, and on March 29, 2011, SSA denied Plaintiff's request. *Id*. at 76-79. On
3  April 20 2011, Plaintiff filed her request for hearing. *Id.* at 83. On November 10, 2011, a
4  hearing was held before Administrative Law Judge ("ALJ") Larry Johnson. *Id*. at 32. The
5  ALJ issued an unfavorable decision on January 26, 2012. AR at 14-16. On February 28,
6  2012, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on
7  January 3, 2013, review was denied. *Id.* at 1-3 12-13. On March 7, 2013, Plaintiff filed this
8  cause of action. Compl. (Doc. 1).

### ***B.    Factual History***

Plaintiff was forty-one (41) years old at the time of the administrative hearing, and thirty-two (32) at the time of the alleged onset of her disability. AR at 32, 50, 59, 149, 181, 208, 234, 237. Plaintiff possesses a college education, with a degree in accounting.[1] *Id.* at 155, 277, 286-87, 297. Plaintiff has worked intermittently before and after the alleged onset of her disability in a call center, in fast food, as an auditor, as a bookkeeper, and for the Census Bureau. *Id.* at 36, 40, 155, 171-78, 277, 297.

At the administrative hearing, Plaintiff testified that she currently lives in a house on an acre of land, both owned by her ex-husband, who pays the mortgage. *Id.* at 44. Plaintiff further testified that she has no income, and spends her time with her dogs, walking on her property, reading and watching television. *Id.* Plaintiff further testified that she is on AHCCCS and receives food stamps. AR at 45. Plaintiff testified that she does not drive and takes a nap for two (2) to three (3) hours every afternoon. *Id.* at 37-39, 45. Plaintiff further testified that the nearest bus stop is several miles from her home, which is too far for her to

---

[1] Plaintiff's precise degree type is difficult to ascertain on the record before this Court. Plaintiff's Disability Report - Adult - Form SSA-3368 indicates that she completed four (4) or more years of college. State agency consultant Kathleen V. Prouty, Ph.D. states that Plaintiff has an associate's degree in accounting; State agency consultant Enrique Suarez, M.D. reports Plaintiff as having a bachelor's degree in business administration; and State agency consultant Dennis Thrasher, M.D. reports Plaintiff has a bachelor's degree in accounting.

- 2 -

1 walk to. *Id.* at 38-39.

2 Plaintiff testified that she has been unable to return to work because her heart
3 condition causes her to "get real tired real easily." *Id.* at 37, 40-41. Plaintiff further testified
4 that her defibrillator "kicks in a lot." *Id.* at 37, 40-43. Plaintiff also testified that she has
5 "dizzy spells." AR at 38. Plaintiff further testified that she has "arthritis real bad now in the
6 hips" with early osteoporosis. *Id.* at 40.

7 Plaintiff testified that migraines also keep her from doing any bookkeeping work,
8 because she "easily get[s] migraines from the computer." *Id.* at 41-42. Plaintiff further
9 testified that these headaches will typically last two (2) and a half days, and occur two (2) or
10 three (3) times per month. *Id.* at 42. Plaintiff testified that she takes Meperidine, a generic
11 form of Demerol for her migraines. *Id.* Plaintiff further testified that although the Demerol
12 eventually relieves her headache it takes "two and a half days for it to even work." AR at 46.
13 It also causes side-effects, such as itching and sweats, which Plaintiff testified she relieves
14 with Benadryl, which in turn makes her drowsy. *Id.*

15 Plaintiff testified that she has pain in her chest once or twice per day; however, her
16 "heart doctor says that's normal for the heart disease [she has] and there's nothing they can
17 do for it." *Id.* Plaintiff further testified that she has suffered from ulcers since she was seven
18 (7) years old. *Id.* As a result, she cannot take aspirin or ibuprofen. *Id.* Finally, Plaintiff
19 testified that there is no work that she believes she could do on a forty (40) hour per week
20 basis. *Id.* at 47.

21 On September 26, 2005, Plaintiff was seen by William L. Abraham, M.D., for
22 vomiting, diarrhea and a migraine. *Id.* at 266-67. Dr. Abraham noted Plaintiff's history of
23 IHSS, catheter ablation and ICD. *Id.* Dr. Abraham also noted Plaintiff's history of peptic
24 ulcer disease and dysmenorrhea. AR at 266-67. On December 14, 2005, Plaintiff was seen
25 by Katy R. Nance, P.A.-C. for upper arm pain after baking cookies. *Id.* at 265-66. During
26 that visit, Plaintiff also complained of insomnia and occasional headache. *Id.* Physical
27 Assistant ("PA") Nance diagnosed right shoulder tendinitis. *Id.*

28

On January 23, 2006, Plaintiff was seen by Dr. Abraham for mid abdominal pain at bed time with stress. *Id.* at 264. Plaintiff also complained of right lateral wrist pain and chronic insomnia. AR at 264. Dr. Abraham diagnosed tendinitis. *Id.* On February 20, 2006, Plaintiff was seen for a rash on her bottom due to a milk allergy. *Id.* at 263-64. On March 22, 2006, Plaintiff was seen by Dr. Abraham for a dry cough, without abdominal pain. *Id.* at 262-63. On April 19, 2006, Dr. Abraham saw Plaintiff regarding her lab results and insomnia. *Id.* at 261-62. On July 21, 2006, Plaintiff saw PA Nance on a follow-up regarding her insomnia and anxiety. AR at 260-61. Plaintiff also complained of a headache with dizziness and nausea. *Id.* On October 5, 2006, Plaintiff saw PA Nance regarding her insomnia and difficulties obtaining a mammogram due to her ICD. *Id.* at 258-59. PA Nance noted that Plaintiff "feels Cymbalta is working well for her." *Id.*

On February 21, 2007, Plaintiff followed-up with PA Nance regarding her insomnia. Plaintiff reported that Rozerem was working well; however, she never called for a refill. *Id.* at 257-58. Plaintiff also obtained refills of Cymbalta and Aciphex, "which [were] working well without side effects." AR at 257-58  On May 7, 2007, PA Nance saw Plaintiff for a physical. *Id.* at 256-257. Plaintiff complained of itching on tramadol, as well as a rash on her cheeks for two (2) days. *Id.* Plaintiff further reported her gastroesophageal reflux disease ("GERD"), anxiety and insomnia as stable, and that she was scheduled to see her cardiologist the following week. *Id.* On May 15, 2007, Plaintiff was seen with a severe migraine with nausea and vomiting. *Id.* at 254-55. Dr. Abraham prescribed Demerol and Phenergan. AR at 254-55. On September 18, 2007, PA Nance saw Plaintiff for a follow-up regarding her migraines. *Id.* at 253-54. Plaintiff required a refill on her Demerol, as well as Soma for her headaches. *Id.* Plaintiff also complained of her left fourth and fifth digits getting numb while typing which abates when she ceases typing. *Id.* Moreover, she did not report any pain in arms or neck. *Id.*

On January 18, 2008, Plaintiff followed-up with PA Nance after a vaginal hysterectomy with left oophorectomy performed on December 27, 2007 by Dr. Sherman.

- 4 -

1  AR at 252-53.  Plaintiff reported that she was recovering well, and that carpal tunnel
2  syndrome symptoms were stable wearing splints.  *Id.*  Plaintiff further reported that she was
3  getting a divorce, but that her stress was low.  *Id.*  On April 24, 2008, Plaintiff complained
4  to PA Nance of increased "migraines since starting divorce process."  Plaintiff reported
5  needing refills of Demerol and Phenergan, but otherwise felt well.  *Id.*  Plaintiff also reported
6  that she had forgotten to have her previously ordered lab work done.  *Id.*  On October 7,
7  2008, Plaintiff was seen for a physical.  AR at 248-49.  Plaintiff reported being under stress
8  with work and pending divorce.  *Id.*  Plaintiff further reported that "she [was] not depressed
9  . . . just stressed."  *Id.*  Plaintiff was also overdue for her cardiology follow-up.  *Id.*

10  On September 3, 2009, Plaintiff was seen by Katy R. Hoeft, P.A.-C. for a physical.
11  *Id.* at 246-47.  Plaintiff reported having lost her insurance for awhile, but had obtained it
12  again.  *Id.*  Plaintiff reported that she was "off all medications but would like to restart."  AR
13  at 246-47.  Plaintiff further reported that her GERD had returned, as well as migraines, and
14  requested medication refills.  *Id.*  Plaintiff also reported that "[s]he is a little more depressed
15  with mind racing[,] [and] [w]ould like to restart Cymbalta."  *Id.*  Additionally, Plaintiff had
16  her first genital herpes outbreak in five (5) years.  *Id.*   Plaintiff has received an annual
17  ultrasound in lieu of a mammogram due to her ICD.  *Id.*  On September 4, 2009, Plaintiff
18  followed up with Lionel Faitelson, M.D., F.A.C.C. "regarding hypertrophic cardiomyopathy
19  with LVOT gradient, status post single chamber ICD seven years ago, dyslipidemia, and
20  remote alcohol septal ablation."  AR at 271.  Plaintiff denied "chest pain or dyspnea[,] [s]he
21  had some beeping in her defibrillator [and] comes for a check."  *Id.*  Upon examination, Dr.
22  Faitelson noted "[m]id-to-late systolic scratchy ejection murmur[,] [n]o diastolic murmur[,]
23  . . . [l]ungs are clear[,] [and] [t]here is no edema."  *Id.*  Dr. Faitelson also performed an
24  echocardiogram.  *Id.* at 274-75.  Dr. Faitelson recommended an ICD generator change.  *Id.*
25  at 271.  On September 10, 2009, Dr. Faitelson replaced Plaintiff's ICD generator.  *Id.* at 272-
26  73. On September 15, 2009, Plaintiff had a follow-up with PA Hoeft regarding her lab work.
27  AR at 244-45.  Plaintiff reported having "[h]ad [a] new implantable device done this week"
28

and was feeling well. *Id.* On September 17, 2009, Plaintiff followed up with Lionel Faitelson, M.D., F.A.C.C. "regarding hypertrophic cardiomyopathy with previously implanted single-chamber ICD." AR at 270. Dr. Faitelson notes that Plaintiff "had dyslipidemia and a previous alcohol septal ablation." *Id.* Dr. Faitelson further reported that her "[p]roblems are stable [and the] [i]ncision site [for the ICD] has well healed." *Id.*

Pursuant to request by Arizona Department of Economic Security ("AZDES"), Plaintiff was referred for evaluation by Kathleen V. Prouty, Ph.D. and examined on November 19, 2010. AR at 276-78. Dr. Prouty reviewed the forms provided by Disability Determination Services, performed a clinical interview and mini-mental state examination ("MMSE"). *Id.* at 277. No medical records were provided for review. *Id.* Dr. Prouty stated that "[t]he claimant reported having medical problems and denied any significant clinical depressive symptoms." *Id.* at 278. Dr. Prouty further reported Plaintiff's "mood and affect were pleasant and appropriate." *Id.* Dr. Prouty reported Plaintiff's MMSE score as 30/30 and a Global Assessment of Functioning ("GAF") score of 75. AR at 278. Moreover, Plaintiff's "[b]asic cognitive and memory functions are grossly intact." *Id.* Finally, Dr. Prouty did "not support a disability based on a mental impairment at this time." *Id.* The ALJ relied on Dr. Prouty's findings in his decision. *Id.* at 20.

Pursuant to request by the Commission, Plaintiff's medical records were reviewed by Randall J. Garland on December 9, 2010. Dr. Garland found Plaintiff had mild restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence or pace; and repeated episodes of decompensation, each of extended duration. *Id.* at 55. Pursuant to request by the AZDES, Plaintiff was examined by Enrique Suarez, M.D. *Id.* at 280-88. Plaintiff saw Dr. Suarez on December 17, 2010. AR at 280, 286. Dr. Suarez interviewed Plaintiff and performed a physical examination. *Id.* at 286-88. Dr. Suarez's assessment indicated a history of irregular heartbeat and pacemaker inserted in 2009; depression, but "not much today[;]" ulcer without objective findings and Plaintiff taking Tums to control; and migraines without medication.

*Id.* at 287. Based on his assessment, Dr. Suarez did not believe that Plaintiff's conditions had or would impose any limitations for twelve (12) continuous months. *Id.* at 283.

Pursuant to a request by the Commissioner, Plaintiff's medical records were reviewed by Robert S. Hirsch, M.D. on January 4, 2011, and on reconsideration by Raymond Novak M.D. on February 28, 2011. AR at 54, 65. Pursuant to request by the AZDES, Plaintiff was examined by Dennis Thrasher, M.D. *Id.* at 295-302. Plaintiff saw Dr. Thrasher on March 23, 2011. AR at 296, 299. Dr. Thrasher reviewed Plaintiff's medical records, interviewed her and performed a physical examination. *Id.* at 296-98. Dr. Thrasher's assessment indicated a history of IHSS, ICD status, "episodes of lightheadedness that appears to be orthostatic in quality[,]" muscle contraction headaches, atopic dermatitis, ulcer disease (controlled with medication), and depression and anxiety treated by her primary care physician with medication. *Id.* at 298. Dr. Thrasher found that Plaintiff could lift and carry up to ten (10) pounds frequently and up to twenty (20) pounds occasionally. *Id.* at 299. In an eight (8) hour work day, Dr. Thrasher found that Plaintiff was unlimited in her ability to stand or sit. *Id.* at 299-300. Dr. Thrasher further found that Plaintiff was unlimited in her ability to reach, handle, finger or feel, and could occasionally climb stairs and ramps, stoop, and kneel, and never climb ladders or scaffolds, crouch or crawl. AR at 300. Dr. Thrasher additionally found that Plaintiff could is restricted working around heights and moving machinery. *Id.* On March 29, 2011, James J. Green, M.D. performed a records review. Dr. Green's physical residual functional capacity mirrors Dr. Thrasher's report.

On June 2, 2011, Plaintiff returned to PA Hoeft, reporting that she had been without insurance for a year and a half, "and is now ready to establish care." AR at 309, 313, 318, 341. Plaintiff reports that she used Metoprolol daily to control anxiety, and that "[i]t kept it controlled[,] [s]he gets panic attacks without it." *Id.* Plaintiff further reported that she was scheduled to see her cardiologist, and that "[h]e has recommended SSI for her." *Id.* Plaintiff reported that she is no sleeping well, and "[s]ometimes feels depressed[;] [however, she was] [o]ff Cymbalta for 1.5 years[,] [and] . . . doesn't want treatment right now." *Id.* Plaintiff

- 7 -

1  further reported that "[s]he gets a [headache] twice a week[,] [and that] [t]hey used to [be] 
2  very well controlled when she used Demerol once or twice for a migraine. This knock[ed] 
3  them down for a year." *Id.* at 309, 313, 318, 342. Plaintiff reported not having had any 
4  genital herpes outbreaks in a year, and that she "gets an upset stomach from time to time[,]" 
5  but takes Tums at night. AR at 309, 313, 318, 342. She has been "[d]oing well of Nexium 
6  for a year." *Id.* at 310, 313, 318, 342. Plaintiff's physical examination was normal. *See id.* 
7  at 312, 316, 321. Plaintiff laboratory work indicated low Vitamin D and Potassium levels, 
8  high Triglycerides and high LDL Cholesterol. *Id.* at 322, 324-25, 352-54.

9        On June 23, 2011, Plaintiff was seen by Dr. Faitelson for a follow-up cardiology visit. 
10  *Id.* at 331, 362. Dr. Faitelson assessed Plaintiff with "[h]ypertrophic cardiomyopathy with 
11  obstruction, without manifest congestive heart failure, and status post prior alcohol septal 
12  ablation." AR at 331, 362. Dr. Faitelson also noted Plaintiff's "[n]ormally functioning 
13  single-chamber ICD" and that she had "[e]levated Optivol fluid indices in the past, without 
14  obvious congestive heart failure at present." *Id.* Additionally, Dr. Faitelson noted 
15  "[m]ultiple symptoms suggestive of possible underlying anxiety disorder[,] [and] [i]ncreasing 
16  forgetfulness and memory issues." *Id.*

17        On July 14, 2011, Plaintiff was seen by PA Hoeft reporting that she was "having more 
18  [genital herpes] outbreaks with stress[,]" as well as "[m]ore migraines lately due to stress, 
19  needs refill of demerol [sic]." *Id.* at 335. Plaintiff's physical examination was normal. *Id.* 
20  at 338. On June 23, 2011, Plaintiff had an "incomplete" mammogram that required 
21  additional imaging. AR at 360. On August 25, 2011, Plaintiff received a negative 
22  mammogram. *Id.* at 357.

23        On November 11, 2011, Dr. Faitelson completed a Cardiac Residual Functional 
24  Capacity Questionnaire. *Id.* at 366-71. Dr. Faitelson's report indicated that he had seen 
25  Plaintiff two (2) to four (4) times per year since 2004. *Id.* at 366. Dr. Faitelson diagnosed 
26  Plaintiff with idiopathic hypertrophic subaortic stenosis, with a single-chamber ICD, and 
27  hyperlypidemia. *Id.* Dr. Faitelson identified Plaintiff's symptoms as chest pain, dizziness,

28

1 shortness of breath, leg pain, and numbness in hands. AR at 366. Dr. Faitelson noted that
2 Plaintiff was not a malingerer, and she had a marked limitation of physical activity. *Id.* at
3 367. Dr. Faitelson stated that stress plays a moderate roll in bringing on Plaintiff's
4 symptoms, and that she is "incapable of even 'low stress' jobs[.]" *Id.* Dr. Faitelson reports
5 that a "component of [Plaintiff's] anxiety relates to IHSS with protective ICD." *Id.*
6 Additionally, Plaintiff's emotional factors contribute to the severity of Plaintiff's subjective
7 symptoms and functional limitations to a "mild degree." *Id.* Dr. Faitelson reports that
8 Plaintiff's cardiac symptoms are severe enough to interfere with attention and concentration
9 frequently. *Id.* at 368. Furthermore, Plaintiff's impairments are reasonably consistent with
10 the symptoms and functional limitations described in the evaluation. *Id.* Dr. Faitelson
11 reports that Plaintiff's impairments will last at least twelve (12) months. AR at 368. Dr.
12 Faitelson reports that Plaintiff can walk one (1) to two (2) city blocks, and sit for twenty (20)
13 minutes before needing to get up. *Id.* at 369. Dr. Faitelson further reports that Plaintiff can
14 stand for ten (10) minutes. *Id.* Additionally, Dr. Faitelson opines that Plaintiff would need
15 a job which permits shifting positions at will from sitting, standing or walking, and that she
16 would sometimes need to take unscheduled breaks during an eight (8) hour work shift,
17 requiring ten (10) to fifteen (15) minutes every half hour to an hour. *Id.* Plaintiff's legs do
18 not need to be elevated with prolonged sitting, however. *Id.* Dr. Faitelson stated that
19 Plaintiff can rarely lift less than ten (10) pounds, and never lift more than ten (10) pounds.
20 AR at 370. Additionally, Plaintiff can rarely twist, and should never stoop (bend), crouch,
21 climb ladders, or climb stairs. *Id.* Dr. Faitelson directs that Plaintiff must avoid all exposure
22 to extreme cold, extreme heat, wetness, humidity, noise, and hazards (machinery, heights,
23 and so forth), and should avoid even moderate exposure to fumes, odors, dusts, gases, and
24 poor ventilation. *Id.* Dr. Faitelson reports that Plaintiff's impairments are likely to produce
25 "good days" and "bad days." *Id.* at 371. Additionally, this will occur more than four (4)
26 days per month. *Id.* Finally, Dr. Faitelson states that "significant stress avoidance (mental
27 and physical) is necessary" for Plaintiff. *Id.*

28

On April 27, 2012, Plaintiff followed up with Dr. Faitelson. AR at 374-76. Plaintiff reported "occasional dizzy spells, usually when she rises from a sitting to a standing position." *Id.* at 374. Plaintiff also denied "chest pain, dyspnea, effort intolerance, orthopnea, paroxysmal nocturnal dyspnea, claudication, palpitations, syncope, edema, . . . shocks, pacing sensation, palpitations, presyncope, syncope, fever . . . [and] side effects from medications." *Id.* Dr. Faitelson reported that a "[r]eview of systems was otherwise unremarkable." *Id.* at 375. Dr. Faitelson also performed an echocardiogram and interrogated and reviewed Plaintiff's ICD. *Id.* at 375, 377-82.

## II.   STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

**III.  ANALYSIS**

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff was not engaged in substantial gainful activity since August 31, 2010. AR at 19. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: idiopathic hypertrophic subaortic stenosis with implantable cardiac defibrillator and migraines (20 CFR 416.920(c))." *Id.* At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." *Id.* at 21. The ALJ found that "[a]fter careful consideration of the entire record, . . . the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 416.967(a)." *Id.* At step four, the ALJ determined that Plaintiff "is capable of performing past relevant work as a telephone solicitor. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 416.965)." *Id.* at 25. Alternatively, at step five, the ALJ found that "considering the claimant's age, education, work experience, and residual functional

1 capacity, there are other jobs that exist in significant numbers in the national economy that
2 the claimant also can perform (20 CFR 416.969 and 416.969(a))." *Id.* at 26. Ultimately, the
3 ALJ determined that "[t]he claimant has not been under a disability, as defined in the Social
4 Security Act since August 31, 2010, the date the application was filed (20 CFR 416.920(f))."
5 *Id.* Plaintiff asserts that the ALJ erred in his treatment of treating cardiologist Dr. Faitelson's
6 November 2011 opinions, his identification of Plaintiff's 2008 call center work as "telephone
7 solicitor," and his evaluation of the lay witness testimony. *See* Pl.'s Opening Brief (Doc. 26).

### A. *Treating Physician Opinions*

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *See also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169

- 12 -

F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).

Here, the ALJ failed to meet this burden. Regarding treating physician Dr. Faitelson's opinion, the ALJ stated in relevant part:

> Because the treating source's opinion reflects a longitudinal perspective of the claimant's impairments and is somewhat supported by medical signs and findings, the undersigned accords some weight to the opinion of Dr. Faltelson [sic]. However, the medical record taken as a whole does not support such severe limitations.

AR at 25. Conversely, the ALJ placed "significant weight" on the opinions of the consultative examiners, as they were able to personally examine Plaintiff and reach a conclusion that was generally consistent with the overall medical record, or in the case of non-examining physicians "review[] the entire medical record." *Id.* at 24-25. "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn*, 495 F.3d at 632. Dr. Faitelson has been Plaintiff's treating cardiologist since 2004. AR at 366. As such, his November 2011 opinion represented his conclusions regarding Plaintiff based upon his treatment of her to date. The ALJ's decision failed to set forth "specific and legitimate" reasons supported by "substantial evidence in the record" as required by the Ninth Circuit. *See, e.g., Rollins*, 261 F.3d at 856.

### B.    *Characterizing Plaintiff's Past Work*

Plaintiff argues that the ALJ misidentified Plaintiff's past work at a "call center" as that of a "telephone solicitor." Pl.'s Opening Brief at 13. The Commissioner argues that "Plaintiff's descriptions of her work at the call center, however, do not indicate that it had a supervisory function." Def.'s Resp. Brief (Doc. 29) at 15. The Commissioner's response, asserts that despite Plaintiff's Work History Report indicates that she spent eighty-five (85) percent of her time supervising ten (10) workers, it does not list any supervisory function rather describing her job as "first answering the phone and later helping coworkers[.]" *Id.*; *see* AR at 172. "[T]he parties agree that if substantial evidence supports the ALJ's alternative step-five decision, any step-four error is harmless." Pl.'s Reply (Doc. 31) at 8.

At step five "the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) (quoting 20 CFR § 404.1560(b)(3)). "The Commissioner can meet this burden in one of two ways: '(a) by the testimony of a vocational expert, or (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2 [("the Grids")].'" *Lockwood v. Commissioner*, 616 F.3d 1068, 1071 (9th Cir. 2010) (quoting *Tackett*, 180 F.3d at 1101). Although the Grids allow the Commissioner to streamline the administrative process, they are only appropriate if a claimant can perform the full range of jobs in a given category. *Tacket*, 180 F.3d at 1101. In light of the ALJ's failure to properly consider Dr. Faitelson's opinions, it is unclear whether Plaintiff can perform the full range of sedentary work. Upon remand, a vocational expert may be necessary.

### *C.  Lay Witness Testimony*

Plaintiff argues that the ALJ erroneously improperly discounted the testimony of lay-witnesses Christian Derr and Carla and Samuel Whitlatch. Pl.'s Opening Brief (Doc. 26) at 14. "If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons 'that are germane to each witness.'" *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). The ALJ found "the statements of Mr. Derr and Mrs. and Mr. Whitlatch to be generally persuasive except in regards to the severity of the claimant's impairments as the medical evidence does not support such severe limitations." AR at 22. Because the ALJ improperly discounted Dr. Faitelson's opinions, reassessment of the lay witness testimony is required upon remand.

### *D.  Determination of Benefits*

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763

- 14 -

(9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester*, 81 F.3d at 834.

Here, the ALJ failed to properly credit the opinion evidence of treating physician Dr. Faitelson. *See Lester*, 81 F.3d at 830; AR at 25. The Court will exercise its discretion not to award benefits, because "there may be evidence in the record to which the ALJ can point to provide the requisite specific and legitimate reasons for disregarding [Dr. Faitelson's] opinion." *Salvaldor v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990). "Then again, there may not be. In any event, the Secretary is in a better position then this Court to perform this task." *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).

**IV.  CONCLUSION**

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)  Plaintiff's Opening Brief (Doc. 26) is GRANTED;

2)  The Commissioner's decision is REVERSED and REMANDED;

- 15 -

3) Upon remand, the Appeals Council will remand the case back to an ALJ with instructions to issue a new decision regarding Plaintiff's eligibility for supplemental security income. The ALJ will give further consideration to the medical opinions of record and articulate what weight is given to each; reevaluate the claimant's residual functional capacity assessment; reassess the lay witness testimony; and reassess steps four and five with the assistance of a vocational expert, if necessary.

4) The Clerk of the Court shall enter judgment, and close its file in this matter.

DATED this 24th day of March, 2014.

_____
Bruce G. Macdonald
United States Magistrate Judge